# Woodward Iron Company v. Wade.

## Injury to Servant.

(Decided April 22, 1915. Rehearing denied June 3, 1915.
68 South. 1008.)

1. *Master and Servant; Injury to Servant; Negligent Order.*—Where an employee seeks to recover under subdivision 3, section 3910, Code 1907, for personal injuries in executing an order of the employer or his vice principal, such employee must show that the order was a negligent one by showing that the person giving the order, knew, or ought to have known that the execution of the order would expose the employee to some peril beyond the ordinary risks of the service, and against which ordinary care would not probably suffice to protect him.

2. *Same.*—Where the peril to an employee was one which he might readily avoid while executing an order, and was obvious, the employer could assume that the employee would discover the peril and avoid it; hence, such an order could not be said to have been negligently given within the terms of subdivision 3, section 3910, Code 1907.

3. *Same.*—Where the peril to an employee executing an order of the employer was not obvious, but inhered in the conditions surrounding him, which conditions the employer could and should have known, and of which if not remedied, the employee could expect the employer to reasonably inform him, the employer giving the order without any warning was guilty of actionable negligence within subdivision 3, section 3910, Code 1907.

4. *Same; Relation; Independent Contractor.*—Where an experienced coal miner contracted to drive a heading in a mine for compensation payable by the year for the rock and mineral removed, and hired his own help, and did the work in his own way, except that he was responsible to the owner of the mine for doing the work according to the rules and regulations of the mine, he was an independent contractor, and not an employee.

5. *Same.*—Where the instrumentality which caused injury to an employee was not completed, and the injured employee was working on it to bring it to completion, the employer was not subject to the liability imposed on him upon the instrumentality becoming finished and in the regular use in the normal course of business, and the duty resting on him to furnish safe ways, work, etc., was for the time being suspended.

6. *Same; Independent Contractor.*—Where the injured person was an independent contractor but responsible to the owner of the mine for doing the work according to the rules of the mine, and it was his duty to keep to the centers as furnished by engineers in driving an entry and after driving it for some distance it was discovered that

it had gotten off the center about three or four feet, and the bank boss ordered him to put the track on center, such order was a general one and the contractor could not recover for injury caused by rock and coal falling on him by the removal of props necessary in carrying out the order.

7. *Appeal and Error; Review; Bill of Exceptions; Evidence.*— Where a diagram was not included in a bill of exceptions, but was explained in the bill of exceptions, and was visible to the jury during the trial, and used only to show facts irrelevant to the issues, the failure to include the diagram as such in the bill of exceptions will not prevent the court on appeal from reviewing the refusal of the trial court to give the general affirmative charge for defendant.

APPEAL from Birmingham City Court.

Heard before Hon. JOHN C. PUGH.

Action by John Wade against the Woodward Iron Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

The complaint is framed under subdivision 3 of the Employers' Liability Act, and alleges that plaintiff was injured, while working for defendant in its coal mine, by rock and coal falling upon him, which was proximately due to the negligence of defendant's superintendent, one Henderson, in ordering plaintiff to put the entry in which he was working on center. Besides the general issue, defendant filed several pleas setting up the contributory negligence of plaintiff in that he negligently removed a prop or timber which supported a rock in the roof of said mine, which he knew, or could have known by the exercise of ordinary observation, was likely or liable to fall upon him. Demurrers to these several pleas were overruled, except as to plea 4.

The evidence shows the following facts (without dispute except as noted) : Plaintiff was an old and experienced miner at the time he was hurt, having worked in the mines, shooting coal and driving headings, for 12 or 13 years. He contracted with defendant's bank boss, Henderson, to drive a certain heading from the main entry, for which he was paid by the year for the

rock and coal removed. He hired his own help and did the work in his own way, except that he was responsible to the company for doing the work according to the rules and regulations of the mine. The heading was 7 feet high and 9 feet wide, and the coal was removed for a width of 20 feet, and the brushing thereby made was 3½ to 4 feet in height, with a rock slab for its roof. Plaintiff testified: "I put those props in there, and it was my duty. The props were put into hold the slabs. * * * If the props had not been placed there, the rock would have fallen down, if it had been broken anywhere, and it was necessary to put the props in for safety. The bank boss told me to put the props in. He did not tell me at every point where to put the props. I used by own judgment about that."

After driving the entry for about 200 feet, it was discovered that it had gotten off center about 3 or 4 feet. Henderson told plaintiff, two or three days before the accident, to put the track on centers; that it would have to be there. It was plaintiff's undertaking and duty to keep to the centers as furnished by the engineers, and the evidence was in dispute as to whether he was at fault in losing them.

After some argument as to extra pay, plaintiff undertook to carry out Henderson requisition to get the heading and track on the centers, and this involved a carrying out a section of the track and shooting down the rock above the brushing just above several of the props, and the taking out of the prop before shooting the roof. Plaintiff testified that the removal of these props was absolutely necessary, and that Henderson made these conditions; that it was Henderson's duty, as foreman, to inspect all places where people worked, and, if anything was wrong, to notify them, and, if everything was all right, to tell them; that, when he went

to work on this occasion, he asked Henderson how this place of work was, and Henderson said it was all right. Plaintiff gave the following account of what occurred after he had moved a section of track in his undertaking to put it on center: "Before I took out the job, I took my ax and sounded the top. It sounded good all the way across. It didn't give any evidence of any crack; nothing to indicate that that rock would fall. I don't know of anything else I could have done to ascertain whether that rock was safe, not in particular, and I don't know in general, unless I had got up there with my lights and rubbed it over there. I couldn't find anything with the light I had. I had a miner's lantern, and did not try it with that. I tried the top with my ax, and had a light on my head, and did not see anything. It appeared to me perfectly safe, and sounded good as far as I sounded it. Didn't sound drummy. When a rock is loose and liable to fall, you can take a hammer and sound it, and it sounds drummy. * * * I sounded the rock around the timber, and it sounded solid. The top did not have a sign of a crack in it that we could find. I knocked the timber out with my ax. Without warning the rock fell and caught me. * * * The handle of the ax was about a foot and a half long. I was standing under the low top. There wasn't any shattered rock over me. I could not have stood under the high top and taken my hammer and knocked that prop down. I guess I could have taken another piece of timber and knocked it down, and that would have been easy to do. * * * Yes, I could with a piece of timber, have stood under the high top and knocked the props out without any trouble, but I stood under it, and I knew that prop was there for the purpose of holding up that rock, and I had put it there. No, I did not know it was there to hold up that rock. That rock

was good and strong. It is customary with miners to set up props whether the rock is loose or not. That rock right there was sound and all right at the present time."

With respect to his duty and authority over the heading, plaintiff testified: "I always asked Henderson about my place in going down and up. Yes, I had entire charge of that heading while I was driving it. I had to set up the timbers and take care of the job. As far as a miner had anything to do with it, I did, and I had to get out the coal. From the time I went down and came up the heading was under my entire charge. While I was out it was in charge of the company, but that was my working place. They were not under any obligation to do any propping there, nor to take down any prop. My duty was to timber up the heading and take care of it, of course. * * * Yes, sir; I said it was Mr. Henderson's duty to inspect the work every time I finished, to see if it would be safe for the following shift to go to work; that is, if there was any gas or loose rock in there. If I saw loose rock, it was my duty to take it down. It was also my duty to examine my working place. I took down one prop, and the rock fell in about four or five minutes after I took the timber down. * * * After I took the prop down, I was fixing to come out from under the brushing to light my shot. I had the hole bored and tamped up, and I was aiming to fire my shot and take the rock down and put it away."

One Dalrymple, assistant general superintendent of defendant, having 18 years' experience in and over mines, testified: "That it is possible, in removing a prop, to tell whether the rock is going to fall or not. There may be cases where one could not tell, but I fail to see them. A loose rock is bound to give warning if

you properly test it. You can test it by sound, but some don't believe in that, or by your sense of touch—put one hand against it and rub. Most practical miners test it by sound. The thickness of it determines the sound that gives. As to whether or not it is safe to stand under a roof where you are going to knock the props out, it is the height of folly to knock the prop out in the manner in which this was knocked out. Where timbers had to be removed from under the roof, they could be shot out with dynamite, and this was frequently done; but it was allowed to be done only by the regular shot firer."

The bank boss, Henderson, testified: "I did not have any supervision or control over Mr. Wade while driving his heading. Nothing only when he did not do his work right. I was supposed to see that he done it right. He was to use his own judgment with reference to driving that heading, as to the time of doing it, the way of doing it, and manner of doing it. * * * It is the duty of one driving a heading to keep it on certer. If he fails to keep it on center and gets off center, it is his duty to put it back on center."

Defendant requested the general affirmative charge, which was refused, and there was verdict and judgment for plaintiff.

CABANISS & BOWIE, for appellant.

RICHARD H. FRIES, and C. P. BEDDOW, for appellee.

SOMERVILLE, J.—(1) The burden of proof is on the plaintiff to show that the master's order, in the execution of which he was injured, was a negligent order, under the circumstances, or he cannot recover under the third subdivision of the Employers' Act (Code, §

3910). That is to say, it must have been reasonably apparent to the master, or his vice principal who gave the order, under the condition as he knew or ought to have known them, that the servant's execution of his command would expose the servant to some peril, beyond the ordinary risks of his service, and against which ordinary and reasonable care on his part would probably not suffice to protect him.—See 1 Labatt on M. & S., § 347.

(2) If this peril was obvious to the servant, and might readily be avoided by him while fully discharging his duty of service in conformity with the order given him, the master had the right to assume that the servant would both observe the peril and avoid it; and the order was not negligently given.—*Davis v. Western Ry. of Ala.,* 107 Ala. 626, 633, 18 South. 173.

(3) If, on the other hand, the peril was not obvious, but was inherent in the conditions necessarily surrounding the servant while executing the master's order (conditions which the master could and should have known, and of which, if not remedied, the servant could expect the master to seasonably inform him), the master's order, without such warning, was negligent and actionable.—1 Labatt on M. & M., § 437.

(4, 5) Under the evidence, it is clear that, with respect to the driving of this entry, and its completion according to the contract (including the putting of the track on center, as required by defendant's bank boss), plaintiff was an independent contractor; and, even if not technically such, his relation to defendant, and the precautions required of defendant with respect to the condition of the entry, were materially different from the case of an ordinary miner working in its mines.

"It is well settled that where the instrumentality which caused the injury was still incomplete at the time

of the accident, and the injured servant was engaged in the work of bringing it to completion, the question whether the master was in the exercise of due care is determined with reference to a lower standard than that which is applied in the case of instrumentalities which have been put in a finished condition, and are in regular use in the normal course of the business. A similar qualification of the master's liability is admitted where the express purpose of assisting in the repair, demolition, or alteration of some instrumentality, and the unsafe conditions from which the injury resulted, arose from or were incidental to the work thus undertaken by him."—1 Labatt on M. & S., § 29.

This doctrine has been sanctioned by this court.— *Tobler v. Pioneer M. M. Co.*, 166 Ala. 482, 506, 52 South. 86, 95. In that case we said: "The duty which originally rests upon the master to furnish safe ways, works, and machinery for the time being, and for the purpose of construction or repairing, is suspended. It would be unreasonable to hold the master to the same degree of strictness, while he is constructing his plant or repairing the ways, works, or machinery, as is required of him after he has constructed, or after the repairs have been completed, and the plant is in operation."

(6) In the present case we feel no hesitancy in declaring that upon the undisputed evidence, and as a matter of law, the instruction given by Henderson to plaintiff to put the entry or track on center, was not a negligent order, and that defendant is not liable for the injury suffered by plaintiff.

The order was general in its terms, and required of plaintiff what was necessary to be done, and what he was employed to do; and he undertook to do it in his own way, so far as methods and details were concerned.

Conceding that its accomplishment required the removal of the props which supported that section of the roof, in order that the roof might be shot away, it by no means required that plaintiff should either go under the low roof, or remain there four or five minutes after a prop had been removed.—1 Labatt on M. & S., § 444. Henderson had the right to assume that plaintiff would avoid an utterly unnecessary exposure of his person to a danger of which experience must have warned him, and of which common sense must needs have informed even the most inexperienced.

A general instruction to a person who has undertaken to do a piece of work, involving judgment, skill, and care, to make it conform to contractual requirements, is a very different thing from ordering a dependent servant to do a particular act of service. Conceding that it was defendant's general duty to inspect all the places where its employees worked, and to give warning of gas and of rocks that were working loose in the roof, it was not under any duty to test this roof as to its stability without supports while its alteration was under way, under the exclusive control and direction of plaintiff, a skilled contractor whose duty it confessedly was to put in all props, to timber up the heading and take care of it, and to examine his place of work, and who moreover knew and understood the conditions to be encountered better than any servant of defendant.

But suppose the bank boss, or other vice principal, had made an inspection in the customary and approved way, viz., by sounding the overlying rock with a hammer shortly before the accident. Plaintiff's own testimony, in no wise disputed, demonstrates to a certainty that nothing would have been discovered indicative of loose rock or of specific danger therefrom; and hence

it is clear the catastrophe would not have been thereby avoided. Henderson's statement to plaintiff that "the place was all right" could not have been intended or accepted as other than a general assurance of general conditions. Clearly plaintiff could not and did not accept it as an assurance that the rock over the props had been tested and would stand if the props were removed. On the contrary, he recognized his own duty in the matter, and made a proper and careful test for himself, which satisfied him so thoroughly that he placed himself under the unsupported roof, which he even now testifies was then "sound and all right." This case is, as to essential facts and elements, very like the case of *Adams v. Corona C. & I. Co.*, 183 Ala. 127, 62 South. 536, where it was said: "According to plaintiff's own testimony, if the rock was loose it was his duty to have discovered that it was loose. If it was not loose, then the bank boss could not have been negligent."

In this connection we quote with approval the following pertinent statement of the law: "In mining, as in other vocations of life, it is necessary to employ skilled employees to handle different departments of the business, and such employees are frequently better informed of the risk and necessities of their particular branch of the business than the employers themselves. To hold that such an employee, with full knowledge of the dangers and attendant risks, could rely upon his own judgment as to the liability of a given slab or bowlder to fall, and then, after an injury, hold his employer for the resulting injury, would be to make the latter responsible for the lack of judgment of his employees, and this the law does not attempt to do. In all the different trades and callings where others are employed, it is elementary law that if the employees possess equal or superior information to the employ-

er, in regard to the danger from a given place or appliance, then, in case an injury results, the employee is held, in law, to have assumed the risk, as an incident of his employment. This well-known doctrine of the law of master and servant applies to injuries resulting from slabs and bowlders in mines, as well as to other injuries, from different causes, in such vocation."—White on Personal Injuries, § 395.

On these undisputed facts no negligence can possibly be imputed to Henderson in requiring plaintiff "to put the entry on center." It results that plaintiff made out no case for submission to the jury, and the court erred in refusing to give the peremptory charge for defendant.

In this view of the case we deem it unnecessary to pass upon several other questions of pleading, evidence, and refused charges, presented by the assignments of error.

(7) It is urged by the appellee that we cannot on this appeal find error in the refusal to give for defendant the general affirmative charge, for the reason that several of the witnesses referred during their testimony to a diagram drawn on a blackboard and visible to the jury, and this diagram is not included in the bill of exception. What this diagram showed, however, was fully explained in the bill of exceptions, and all this clearly appears from the evidence without the aid of a diagram. It clearly appears, also, that the diagram was used only for the purpose of showing how and at what extent the "centers" furnished by the engineers were obscured from plaintiff's vision, and hence to show who was to blame for his getting off of center. That inquiry, if relevant to any issue, was wholly irrelevant to the question of defendant's negligence in giving the alleged order to plaintiff, and it is not conceivable that such

a diagram could exert the slightest influence in the determination of that question. Certainly it could engender no conflict in the evidence relating to that subject, and our conclusion could not be affected by it.—*W. U. T. Co. v. Jones,* 190 Ala. 70, 66 South. 694; *L. & N. R. R. Co. v. Williams,* 172 Ala. 560, 55 South. 218. For these reasons we cannot apply to this case the general rule as illustrated by the cases of *Warble v. Sulzberger,* 185 Ala. 603, 64 South. 361, and *Continental Gin Co. v. Milbrat,* 10 Ala. App. 351, 65 South. 424.

The judgment will be reversed, and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and MAYFIELD and THOMAS, JJ., concur.